for the argument on behalf of Ms. Works. Good morning. May it please the court, my name is Stephanie Herrera and I represent Tony Works. This is Works' second time on appeal having been dismissed before on summary judgment without discovery. After discovery on remand, the district court once again dismissed her case. In its decision on summary judgment, the district court made two contradictory findings that bring us before this panel today. The district court found that on the one hand, a reasonable jury could find in Works' favor as to her performance, while inexplicably, Works' claim faltered by failing to rebut the SSA's proffered reasons for termination, which were related to her performance as pretextual. Here, though she was not consulted at the time of Works' termination, Works' team leader, Noma Carter, a GS-12 and the person in the best position to observe Works' day-to-day assignments, testified that Works performed in a satisfactory manner. Ms. Herrera, hold on one second. Is the microphone turned on? I think so. Okay, good. That's much better. There we go. Okay, I'll do a better job of that. Right, that's great. So, also not consulted, two other GS-11 employees, George Frank and Talia Hughes, who worked with Ms. Works often and were in the best position to observe her day-to-day assignments, found her to be a diligent employee who very much applied herself and found her work product to be of good quality. Except for the seven weeks that she wasn't there because she took so much leave. Although she was out for seven weeks, she was actually present in the workplace 86 percent of the time and this Court has not made any finding that perfect attendance is required in any job, disabled or non-disabled. She didn't have permission to work from home or telecommute or any of that? She did not have permission to work from home or telecommute, but her employer, Ms. Warner, indicated several times that she could have worked with the leave that Ms. Works took. She had, it did not matter to her how many days Ms. Works had taken and that leave was not an issue. So, that's one of the reasons we're here before you today because we don't believe it's an undue hardship. What accommodation did Works ask for that she did not receive? So, during the time frame that she worked for the government, she requested leave and it was approved. She also requested reassignment and she asked for more leniency in terms of the medical documentation she was submitting. That was approved, but later it was held against her. So, the leave that she took was held against her in the removal letter. Reassignment to what? To a less stressful position is what Ms. Works requested specifically, but that would have been... Was that in the meeting when they were firing her? That was in the meeting when they were firing her and she also had an earlier meeting in June that she testifies about in her deposition. She asked for a less stressful job in June, you're saying? She did. Even though she received these accolades regarding her performance, the lower court claimed... Did you say that one of the accolades was from Warner? One of the accolades was from George Frank. He was a GS-11 employee and the other was Talia Hughes, a GS-11 employee. Frank was one of the employees that worked with her after her mid-year satisfactory performance review. Who was her supervisor? Her supervisor was Marjorie Warner. Her supervisor described the appellant's work performance as not acceptable and that she had trouble completing virtually every assignment they had given her. When we were deposing her and she testified at the EEOC administrative hearing, she was not able to provide any evidence of that. She indicated that she had relied upon the team leaders that had assigned her assignments and the team leaders that had assigned her assignments, there was one in particular that was her primary team leader, Noma Carter. Noma Carter testified that Mrs. Works' performance was totally satisfactory, that she had not had any issues and that when Mrs. Works' medication was on point, Mrs. Works was on point. So that was not something that was affecting her. In addition to that, Mr. Johnson Bay, who was the other supervisor involved, had an also said that it was fine in terms of work, in terms of format and style, but it was, there were some errors and it took a little bit of time to get it right, but she performed it and she gave him what he needed. This case concerns the barriers and stereotypes disabled veterans face in the workplace. Works, a former Navy aircraft electrician, is one of those veterans. Her disability, epilepsy, affects 3 million Americans. Hers stems from brain trauma that she suffered in an accident involving an F-16. After receiving disability benefits for many years, Works sought out the opportunity to work again by accepting an entry-level position with SSA, earning just under $30,000 a year. Your Honors have read that Works received SSDI benefits during the first nine months of her employment. Individuals with disabilities are afforded numerous work incentives such as this one under the Social Security Act. This allowance exists because, as noted by the EEOC, Congress recognized the importance of encouraging individuals with disabilities to work whenever possible. When she began working for the SSA, Works' VA neurologist adjusted the medications that prevented her breakthrough seizures. This adjustment period was temporary, as your Honors can imagine, anti-seizure medications cause serious side effects, and these side effects impacted Works' day-to-day activities, including her concentration. However, her team leader, Carter, told Works' managers, William Johnson Bay and Marjorie Warner, that Works was right on point when her medication was at the right level. Works pushed hard to perform well despite little training. Her co-worker commented that her eyes were glued to her computer screen. Another employee said she blew her mind on a project. Works even worked extra hours to earn credit for her leave. Early on, she confided in Warner and told her about her seizure disorder and her medications. In January 2003, she suffered a seizure that resulted in an absence of nearly two weeks. In February, around the time of the worst snowstorm in Baltimore, Works suffered another seizure, this time in the workplace. She was taken away in an ambulance. Despite these breakthrough seizures and her absences from work, on March 19, 2003, Works earned a satisfactory midyear performance review. Though there are other projects now being raised by the agency as deficient or otherwise problematic, Warner only recorded one deficiency, a budget data entry project assigned by Johnson Bay in November 2002. Mr. Johnson Bay has since testified that that project was probably more than Ms. Works could have done at the time because she was an entry-level employee just starting out with SSA. In April, Works assisted GS-11 HR specialist, Frank, with a database. He testified that she had given appropriate attention to what needed to be done, had good work ethics, and if Warner had asked him, Frank would have told her that Works' contribution was also of good quality. He was shocked to hear she had been fired as he had not been consulted or asked about her performance. In May and June, Works suffered more seizures. She returned to work from her protected leave only to be handed the June 23 Probationary Review Memo by Johnson Bay. The project she had with Mr. Frank that you were talking about, is that the one where they made a presentation to Warner and Johnson Bay and that Warner and Johnson Bay testified that it became apparent to them that an appellant had overstated her participation in the project that was really Mr. Frank's project? That is the project that is being referenced by defendant in the appellee's brief. That is the same project, but to clarify, Ms. Warner was present but did not ask Ms. Works any questions during that demonstration. Mr. Frank later testified that it wasn't clear to him what Ms. Works' role was on that assignment. She had initially started out by doing a spreadsheet and he had previously been working on a database that had no due date, that had been around for a year or two, and that he was then not even sure about who was supposed to finish it and if Ms. Works was responsible for finishing it. In addition to that, there was another manager present at Drinkton, Janet Edrington, and she indicated that the only thing that she expected Ms. Works to do during that presentation was to speak up, to say something during the meeting. She did contribute, but no one asked her any questions, so what more were they expecting? What about the fact that all this happened 14 years ago? That is true. How do we factor that into our analysis? Does it make a difference? It makes somewhat of a difference in the sense that, of course, memories fade and it's a little bit more difficult to remember information as years have gone by, but there was testimony from Mr. Johnson Bay and Ms. Warner. There was an investigation conducted by the EEOC back in 2004. There was an unemployment compensation hearing in October of 2003. There is some testimony to help refresh the recollection of the witnesses, and we have that testimony in the record today. After receiving the 2003 Probationary Review Memo, it highlighted deficiencies in her performance and conduct, and Ms. Works tried to speak with Mr. Johnson Bay about it. Mr. Johnson Bay indicated that he actually was not involved in drafting it and that Ms. Warner would be the person to explain that to her, except Ms. Warner had been out most of June dealing with some personal issues, so she was not in a position to even really discuss it with her or to assist Ms. Works in coming up with strategies to improve her performance. Also, in June, Works assisted Johnson Bay with a navigational survey, although there were some hiccups, and I referenced this earlier. Mr. Johnson Bay said, we got the report, and it was all straight, and he had what he wanted. Johnson Bay also reported that the numbers used by Works contain an error in the formula, but he later admitted at deposition that this should have been done by a higher-graded employee, that usually the employment development specialists are the ones who do that type of formula. So it wasn't anything specific about Ms. Works' product. It was something that had to do with the specific formula that, as an assistant, she's a clerical employee at GS-6, she necessarily wouldn't be doing that. Ms. Rara, let me interrupt you just a second. On the retaliation claim, one of the arguments the defendant makes is that this was not addressed substantively in your opening brief. What would you point me to in your opening brief that shows you preserved this issue and argued it? What page would I look at and find your argument on retaliation? That I would point you to, I think, in our reply, we address why we would be in the opening brief. So although it wasn't a substantive argument, it was raised as part of our discussion about determination and the reasons why we believe it to be pretext, and that would have been on page 22, starting on page 19, and the reasons why we didn't believe there were specific reasons for granting summary judgment. We talked about the disputes of material fact, following that on page 20, 21, and 22, we discussed the reasons for pretext. Notably Johnson Bay, the other supervisor, in addition to Ms. Warner, indicated that Ms. Works had completed assignments, and at least to his knowledge and from the supervisors that he spoke to, that she had done a pretty good job. On Friday, July 18th, Works returned to the workplace after using more protected leave, a combination of approved leave without pay and sick leave. Works requested this leave because she had suffered two more seizures earlier that week. Again, I'm sorry to interrupt you, but I'm scared you'll run out of time before I get to ask these questions. On the failure to accommodate charge, you're saying the failure to accommodate the request that was made has nothing to do with leave but has to do with a less stressful job? So actually, we're not even saying that, Your Honor. We're saying that the leave that she was taking that had been approved was then held against her in the termination, and there's inconsistent testimony about this. There's a genuine dispute that should go to the jury. I know, but what's the accommodation that she asked for that she didn't get? So she was taking leave. Her managers were aware of the fact that she was taking leave related to her disability, and so because of that, that was leave that was being used in accommodation as it was in Wilson v. Dollar General Corp. More leave? So she didn't ask for more leave, but her supervisors had the unfounded assumption that she was going to require more leave. So on the day that she was actually, the agency decided to terminate her, she had just told her supervisor that she might, she was trying to schedule brain surgery. So in their minds, they potentially thought, and this should go to the jury, to decide that she might require additional leave. We actually have a document in the record from her doctor saying that that same week, there had been an indication that her seizures had actually stopped because they had increased the medication that she was taking. But the decision had already been made to terminate her, hadn't it? On July 18th. Say that again. On July 18th. She had just returned from her seizures, and she had just taken leave because of those. That leave was all approved leave, and the manager had indicated that she could have worked with the leave. She's a federal employee. She's entitled to 104 hours of sick leave, 104 hours of annual leave. She was able to work credit hours in order to earn credit leave and was using that as well. This is just like the case in Wilson v. Dollar General Corp., where the employee was also allowed leave, and the question before the court then was whether or not he would be recovered after the leave that he had taken. In this situation, Ms. Works was working with her doctors to adjust the medications, and there was every indication that she was going to be recovered and that her medications were going to be fine and that she could continue to work. But the agency knew her probationary period was coming up, and she had just had another seizure in the workplace, and so they decided, let's get her out of here. Her probationary period is only a couple weeks away. So they had an assumption, they made an assumption that she should maybe require more leave. I don't know, but they never engaged in the interactive process to discuss that with her, despite the fact that they knew. There's no prior incident of that. Didn't they give her leave every time she asked for it? They gave her leave every time she asked for it, but she was going through medication changes, and they used the leave as a reason for the termination. So in the termination letter, it says, your frequent absences are part of the reason why you're being removed. But then the manager testifies at deposition, no, I could have worked with her leave. That's not the reason. It was only performance. They raised other issues as well, conduct. She later recanted on that as well. The manager indicated, nope, it had nothing to do with conduct. And in fact, I wasn't in a position to observe that. And the folks that we deposed that were supposedly the people in the position to observe it weren't. They didn't have any reason to believe that. Those facts were in dispute and should have gone to a jury. Okay. Thank you. Ms. Warner, you've got some time reserved after we hear from Mr. Nettinger. Good morning, Your Honors. I may have pleased the Court. An employer has to be able to let go an employee who's chronically absent from the job, regardless of whether they have a disability or not. That's what we respectfully submit this Court found in Tyndall. Even though Ms. Warner says that wasn't a factor. So I want to discuss that. It wasn't something she could have worked with? So Your Honor, I think what the testimony is, and it's very unfortunate, I think that sometimes a gloss is put on it by the plaintiffs. If you look at what Ms. Warner said, leave didn't have anything to do with it. It was the fact that she was not able to perform. And we know that she's not able to perform. Wait a minute. Now you've got a problem because the district judge says there's enough evidence to go to the jury on that issue. So I actually disagree. And again, I think reading the district court's opinion, he bifurcated the performance issue. He said when she was at the workplace, there were some things that she did fine. And that there's a genuine issue as to that. But there's undisputed facts that she wasn't there for copious amounts of time. And we know that when she's not there, she's not performing. It's just like a basketball player, you're going to miss a thousand percent of the shots you don't take. A thousand percent of the time, you're not scoring two points for your team. A thousand percent of the time that she wasn't there, she wasn't performing. So if you look at those 326 hours that she was not at that job, her performance was zero. But doesn't Ms. Warner say over and over again, absenteeism was not the reason she was terminated? So what she said over and over again actually was performance was the reason. And she explained that performance was driven by the fact that she wasn't there to perform. She put that indication on there, again, time and time again, no matter how many times they asked it of her. And I'm happy to cite the court to certain places in the record where she does that because I think it is very, very clear. And it goes also to the conduct issues and the socializing. She said, look, you know, when she's not there and when she's socializing, she's not focusing on her job. And so I respectfully submit that what Ms. Warner said was, in fact, consistent over and over again. Well, tell me, show me in the letter that was sent, the termination letter that was sent to Ms. Works where it says, you're being out on authorized leave is a reason you're being terminated. Well, I don't think it says that, Your Honor. I think what it says is, you know, it issues dependability issues. And it says when you are, if we look at Joint Appendix page 3427. That's what I'm looking at. It says, quote, when you have been out on unscheduled leave, management cannot depend on you being available to accept and perform the assignments as expected. And so. The only thing you're holding against her is her unscheduled leave. Well, yes. And I think unscheduled leave in this instance, as the record shows, relates both to disability and non-disability. How many days was that unscheduled leave during the time she was there? So sick leave, as I understand it, all of the leave that she was taking, if you take out the annual leave, sometimes that was something that she scheduled before. Let's take that out. That was 146 hours. So 146, 326 minus 146, in our view, is unscheduled. Unscheduled leave. Yes. Sick leave. So she took sick leave. She took advanced leave. She took leave without pay. Basically, the agency bent over backwards to just keep giving her leave. Are you counting the sick leave against her? Sorry? Are you counting the sick leave against her? I'm counting that in my 326, because I think that goes to whether she could perform the essential functions of the job. But in terms of what I believe the termination letter says, talking about unscheduled leave, I think that does include sick leave, because in times she was on an emergent basis not able to perform the job. But what I do respectfully submit, Your Honor, is that this is all covered by Tyndall. If you look at the Tyndall case, the employer there had an employee that missed 37 days. Here, Ms. Works missed 40. So we're certainly above what this Court found in Tyndall to be enough. I do want to address a couple of questions that was also asked of my colleague. Judge Thacker asked a question about whether there was permission to telework or work from home. There was not. And we have at Joint Appendix page 465, an admission by the plaintiff, she had to be there to do the job. So that's something that's not in dispute. And it's not in dispute that she wasn't there for copious amounts of time. There's also some discussion about the reassignment issue, and I do want to address that. Reassignment was a decision that actually was not Ms. Warner's to make. Ms. Warner is the only person that's being accused of discrimination here. The person that was deciding the reassignment issue was a woman by the name of Joan Stewart-Stevens. There's no allegation that she was discriminatory in any way. So pursuant to Hill v. Lockheed, I think that issue is not on the table. There was also a question that Judge Keenan asked about how this happened 14 years ago. And I do think the issue before this Court is, do we send this back for a trial? Do we send this back for a trial for something that happened in 2002 and 2003 when there really is no evidence of discrimination here? You know, you have supervisors that gave copious amounts of leave. You have advanced sick leave. They didn't have to give it, but they did. After she had that seizure, they gave that presentation by the nurse to welcome her back. If they really had a discriminatory animus, they would have fired her right then and there. But they kept trying to work with her. And at some point, enough was enough. But also getting to this idea of does this go to a jury? Could a rational jury find for this plaintiff? Looking at Ms. Warner, you have somebody who the plaintiff herself admits went out of her way to accommodate an employee with a latex injury, somebody who was in a wheelchair. Ms. Warner herself learned sign language to communicate with a deaf employee. Ms. Warner herself has a grandson who she treats that has cerebral palsy. There simply is nothing in this record that suggests that a rational jury could find for the plaintiff. And so we respectfully submit that summary judgment was appropriate here. I do want to spend just a couple moments, if I can, on our Cleveland versus policy management argument. That's one I respectfully submit that the plaintiff has not met. If you look at that case, there is this conflict between her representing to SSDI that she is completely disabled and can't perform any job in the national economy, which is about as broad as you're ever going to get. Compare that with what she's trying to have this Court accept, this idea that she in fact was qualified to do the management assistant job. Those are inherently in tension. And how you solve that, what Cleveland says, is you show what accommodation you could do that would allow you to perform the essential functions. And here the only accommodation that she's wanted is leave and copious amounts of it. So in our view, the disconnect is this idea that the accommodation that she wanted was to essentially reject the essence of what the job was. In other words, the accommodation she wants is to not have to do the job. And that, we believe, under Cleveland just doesn't get you there, that she cannot show that she was qualified. And I'm not aware of any case in which this amount of leave satisfied Cleveland. And I've looked, and we have not found anything that would suggest this is appropriate. So I think that's another good, clean legal issue which says summary judgment is appropriate here. I do want to discuss very briefly, too, this issue of leave. And my colleague mentioned the case of Wilson v. Dollar General Store. I actually agree with her when she said that this case is like that one. And when you look at Wilson, what Wilson found was leave is an appropriate accommodation when it shows you can take leave and get back to full employment, get back to doing the job. And the classic example is, if I break my ankle, I'm going to have to be laid up with an ice pack for two weeks, and then afterwards, my ankle will heal and I can stand up in a courtroom again. Leave in that instance allowed me to get back to the job. But here, the leave that we gave Ms. Works never allowed her to get back on the job. And I do respectfully disagree with what my colleague said, that there is evidence in the record about how leave helped her. In fact, I think it's the opposite. So if you look at the leave that she took, it actually only got worse. So her seminal event was in February of 2003. That's when she had this big seizure. And if you look at the pay periods after that, and some pay periods don't always correspond to the month, but roughly if you look at the leave she took in March of 2003, by my calculations she took 29 hours. Then fast forward to May of 2003. She took 48 hours. Fast forward to July. She took 58. She's going in the direction of just taking more and more leave. And what I believe this court in Wilson said is the burden is actually on the employee to show what kind of accommodation they need to get them back to full employment. That's her burden, not ours. And so I think Judge Fracture, you were asking some questions of, you know, how much did she need to get back? There's nothing in this record which ever shows us, oh, if I just have two more weeks of leave, I'll make it. And actually the case in Wilson is even more stark. Wilson, the gentleman, actually asked for two days more of leave. He said, I just need two more days and then my eye issue will resolve. But in Wilson and these other cases, attendance is important. But what Ms. Warner keeps saying is, as far as this plaintiff is concerned, her absenteeism was not a problem. I mean, she says the amount of leave she took was not a factor in the decision to fire. Leave issue was not a major concern. If she'd done her job, I could have worked with her on leave. I mean, she just says this repeatedly. So, you know, if Warner is saying leave is not a problem, then I don't know how the Dollar General case is going to be relevant to you. Right. Well, I do want to push back on that a little bit in the sense that Ms. Warner You push back real hard. That's what we're here for. I was going to say, so respectfully, Ms. Warner isn't saying that leave is not a problem. Who cares? But she's saying Leave issue was not a major concern on page 875. Warner testified the amount of leave she took was not a factor in the decision to fire, page 2561. I mean, I can give you other pages where she says the same thing. Right, Your Honor. And, again, I would respectfully point the Court to the issues where she's qualifying that statement. She's saying leave by itself is not a problem if, and that's the biggest thing here, if she was able to do the job. Like let's say she was out for a week and, you know, all the assignments and she kept saying that if, if, if, and she said she never was able to do the job in the limited amount of time that she had. And that makes sense. You know, folks that worked in, in law firms or have legal assistants, you know, that person needs to be there. It's not just that you can do the job if you come in for a couple hours and then you're out for a couple weeks. You know, stuff backs up. She said if she could have done the job, I could have worked with her with regard to the leave. Right. If, if she could have done the job. And, and, again, That's what it comes down to, though, isn't it, whether or not she could do the job? Well, I think it, it does. I think that's important. And I think in here that the management's view was she couldn't and, and we're not here to be a super personnel department and, and this job she just simply couldn't do. And we have all these admissions by the plaintiff of things that she messed up, things that she wasn't able to do. And, and it's very telling at the end. She even kind of admits, I can't do this job. Reassign me to something different. On top of the fact that she's telling SSDI. Well, I thought she said she, she wanted to be reassigned to another job that was less stressful. Not that she couldn't do it. She wanted one that was less stressful. Well, in our view, Your Honor, that, that's an admission that I can't do this one. This one's too stressful. I got to get something else. And, you know, I think the important thing is, and, and Judge Keenan, I think you might have asked this question, you know, reassign to what? There were no other jobs on, on the table. This was one that she simply could not do. The other thing that I, I think is important here, because we are at summary judgment, there's this question of, of performance. And, and I do want to make clear about what we're talking about here. I don't think it's the government's burden to show that every assignment that she did, she failed on. In other words, if she has a hundred projects, we don't need to show that she failed at a hundred of them. But what we do have here is admissions that she failed at a good number of them. And that's why we think on the performance issue, summary judgment is appropriate. And with all due respect to the District Judge, we actually do disagree that there's a genuine issue of dispute there. Because if you look at what she has admitted, she's admitted, for example, that she messed up a project with Johnson Bay. That's Joint Appendix page 361. There was another project with Johnson Bay later, Joint Appendix page 379. And this one is particularly, I think, galling in the sense that at deposition, she actually was laughing about how she gave him an inappropriate spreadsheet. And then he only found out about it that it was wrong in front of his superiors that really embarrassed him. She admitted that what she did with Yvonne Curry was, quote, not correct and inadequate. That's Joint Appendix page 191. The typing pool assignments, she admits that she was told that she was doing everything wrong. All right. Tell me how do we handle the testimony of Mr. Carter, Mr. Frank, Carter, Frank, and Hughes? Certainly. So I think with regard to Mr. Frank, what's interesting here is that the plaintiff herself actually takes inconsistent views of it. If you look at her testimony in her initial deposition, Joint Appendix page 198, she admits, yeah, Mr. Frank got upset at me. We were at crosshairs a little bit. She admits that. And then 2014, when I depose her, she says, absolutely not. Everything was completely fine. Mr. Frank had no issues with me. So did Mr. Frank say that her work was high quality? So he did indicate that in a later deposition. And again, Mr. Frank himself is internally inconsistent. If you look at what he said at the ALJ hearing, which was closer in time to this issue at the time when Mr. Frank was still with the agency, I think he retired by the time we took his deposition, but I can't remember that now. But in any event, he himself is internally inconsistent. So in my view, we're here at summary judgment. Let's take the inconsistencies off the table for a second. Let's just focus on the plaintiff's own admissions. And as this Court has found, you can't create a genuine issue by, as a plaintiff under oath, making divergent admissions. Once she's admitted that, yes, I screwed up that project, that's what we have to take. She can't later fix it by throwing in some sort of affidavit or correcting it in a subsequent deposition. So I think she's essentially stuck with those issues. Your Honor, you asked a question about Ms. Carter, and Noma Carter is her name. And on her, what I'll say is Ms. Carter also says that, and again, I respectfully push back on my colleague here, it is not that Ms. Carter said that everything the plaintiff did was swimmingly. If you look at Joint Appendix page 2783, Ms. Carter says that the plaintiff didn't do a good job on the project initially and it had to be fixed. I'm paraphrasing, but essentially it wasn't right the first time. It had to be done better. It wasn't that, oh, yes, everything I got from Ms. Works was great. The other thing we have, which I think is very telling, is Johnson Bay's contemporary notes, and that's Joint Appendix page 3432. Those are those notes when Mr. Johnson Bay went to Ms. Carter after one of the meetings in figuring out what's going to happen with Ms. Works. And Ms. Carter says she shouldn't have this job. Ms. Carter actually says what the plaintiff says, that she actually should be reassigned to something else, which in our view is an admission that she can't do this management assistant job. And so in their briefs, I want to point out the appellant says Ms. Carter was against termination. It's a sleight of hand. What really they mean is he was against termination from the agency. Ms. Carter wanted her assigned to a different job, but in terms of the decision to terminate her from the management assistant job, even Noma Carter says it wasn't a good job for her. She couldn't perform at that job. I'll also cite Joint Appendix page 2959. That's where Johnson Bay is asked about this meeting with Ms. Carter and what Ms. Carter said. He actually has some very harsh words about what Ms. Carter said, that Ms. Carter indicated that Ms. Works messes everything up, even though he used a different word. But didn't Carter also say her work was satisfactory? So she did say that at the ALJ hearing. And again, we have this issue where people say conflicting things. So again, my purpose here, we're here at summary judgment. I really just want to focus on what the. Well, we have to look at the testimony and evidence in light most favorable to her. You do, Your Honor. But again, if you have an employee that admits they messed up at least six or seven projects, in our view, that is more than sufficient for this court to find there was performance issues. And again, we don't have to prove all 100 were bad. That outweighs any positive remarks or description she got. Well, I don't know about outweighing, because I actually don't think we should be weighing, to be quite honest with you, Your Honor. I think as long as an employee admits to messing up five, six, seven, eight projects, it is perfectly permissible for the employer to then say there was a performance issue there. But again, you know, my view is we actually don't need to get there in the sense that if she's not qualified, she doesn't have a Rehabilitation Act claim. Pursuant to Cleveland, I think that's also a legal issue. I do agree, Your Honor, that I believe that the retaliation claim was waived. In our view, you just don't see it anywhere in the opening brief. They had to talk about the standards. You know, I'm here trying to defend this argument below, and I don't know which prong of the prima facie case they're trying to say that they met. So I do believe that claim is waived. And before you run out of time, would you address her failure to accommodate claim? Certainly, Your Honor. So I think it is somewhat difficult to follow. But essentially, the agency gave every accommodation to her that she asked for. And, you know, I'm not aware of any accommodation that she didn't get. So I think just looking at the prima facie case that she needs to show for retaliation, I just don't think she gets there. So I'm running out of time, and I just have a couple more seconds to respond, Your Honor. Real quick. Just briefly, Your Honor, I think this issue of holding it against her, I think, is remedied by what Warner said, the idea that if she was able to perform, if she could show something in the record, like Wilson requires, that with just two more weeks, I would have gotten back to full employment, I think we'd be in a different posture. But here, we gave her all the leave, and it never was enough. Okay. Thank you, Your Honor. All right, Ms. Herrera. Ms. Herrera, one of the points he makes, and he makes in his brief, is that your lady was collecting disability payments, saying she couldn't do any job in the national economy. At the same time, she is working here and claiming she can do the job. So why doesn't the fact that she's collecting disability benefits preclude her from bringing this action? So this is actually addressed in her brief, but to explain more in detail, under the Social Security Act, she is allowed to, as a work incentive, to collect benefits for the first nine months as a trial work period. And she was part of that trial work period. After the nine months, she was actually removed from the, she stopped collecting those benefits. So it was not something that she was purposely doing. This was a work incentive by SSA. Certainly, we recognize that that would seem appear double-dipping, but it's not contradictory at all. It is very much within what is lawful. And the same applies for statements that she made later to go back on disability benefits. She was very clear in those statements that the reason she was going back is because her supervisor had, her managers had fired her, and she was not accommodated in the workplace, and that it was as a result of not being accommodated in the workplace. So she was not making inconsistent statements. She did everything that Cleveland requires. And you have a similar case in the circuit, Greater Baltimore, that similarly makes that same requirement. In Greater Baltimore, the employee actually was passively collecting SSDI benefits and was telling his employer he could go back to work, and those were clearly inconsistent positions. So Ms. Works has done nothing of the sort. In addition... What about the Bankers Box incident? I mean, apparently that was the precipitating event before. So the Bankers Box incident actually happened after Ms. Works had been terminated. So they had already made a decision on July 18th to terminate Ms. Works. She set up a meeting on July 25th to meet with her employer. They had already had the letter ready to go. They spoke with her that morning. She brings in a Bankers Box that has copies of her work product. A stunning example of incompetence. There is no reason to believe that the product, the work product in that box was deficient in any way. When we deposed those managers, they said they're not able to recognize computer code. They had no reason, they didn't examine it closely. Someone only looked at it for a few seconds. Two different managers, Warner and Edrington, looked at it, and they said, no, I'm not in a position to say whether this is actually the materials that demonstrate good work or not. The same material was photocopied, didn't it? They testified that, and that material was later destroyed. No one kept a copy of it. And they actually said, I'm not in a position to analyze whether this is a database code. Remember, she was working on projects to create databases and spreadsheets.  Potentially, it's the code. I'm not in a position to analyze whether or not it's computer code. They weren't either, and they admitted to that. So they couldn't say whether or not this was actually her work product that was copied over and over again, because they didn't examine it that closely, and they weren't in a position to actually decide whether or not this was computer code that was copied over and over again. So, in addition to that, I wanted to address a couple of points that Mr. Mettinger made. Just to point out something that had already been said, essential functions rely upon an employer's judgment. And this is a question of fact for the jury, because Ms. Warner did say repeatedly that she could work with her, and it didn't matter how many days. And although Mr. Mettinger indicated that she qualified this and indicated that if she could meet the legitimate expectations of the workforce, she would be able to complete these projects and do these things, that wasn't actually what she testified to. They specifically asked her, did you hold that leave against her? Did it matter how many days? And she said, no, I didn't. So it wasn't that at all. In addition to that, that's a question for the jury. That's something that the jury should be allowed to decide. You already heard that the district court had made a finding that the performance was in dispute. That is the case. Although Mr. Mettinger has indicated a couple of times now that there were six or seven projects that our client admitted to having messed up on, that's not the case at all. She talked about two projects at the very beginning of her employment that, yes, she had an issue with. But she was still rated satisfactory in March of 2003. So even if these projects were problematic in some way, her manager still found her satisfactory. She was doing fine as of March of 2003. It wasn't until she had a seizure in May and then again in June that she was suddenly given this June 23rd probationary performance review. No reason other than that. She had not, Ms. Warner wasn't even in the workplace to observe her performance in June. So they made this document up? I have no idea. And the things that were addressed specifically, the conduct issues, those are all disputed facts. We have record testimony from various co-workers and other GS-11 employees that didn't observe any of these conduct issues despite the fact that Warner relies on it so heavily. Thank you. Thank you. We'll come down and reconcile and then go on to our next case.
judges: William B. Traxler Jr., Barbara Milano Keenan, Stephanie D. Thacker